IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

STATE V. MORTON

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,

V.

NATAVIAN Q. MORTON, APPELLANT.

Filed February 12, 2019.    No. A-18-941.

Appeal from the District Court for Lancaster County: LORI A. MARET, Judge. Affirmed.

Mark E. Rappl for appellant.

Douglas J. Peterson, Attorney General, and Matthew Lewis for appellee.

PIRTLE, RIEDMANN, and WELCH, Judges.

PIRTLE, Judge

INTRODUCTION

Natavian Q. Morton was 16 years old when he was charged in the district court for Lancaster County with second degree murder, unlawful discharge of a firearm, and two counts of use of a firearm to commit a felony. He filed a motion to transfer the case to juvenile court, which was denied. Morton appeals, assigning error to the denial of the motion to transfer. Based on the reasons that follow, we affirm.

BACKGROUND

On May 31, 2018, the State filed an information charging Morton with second degree murder, a Class IB felony; unlawful discharge of a firearm, a Class ID felony; and two counts of use of a firearm to commit a felony, both Class IC felonies. The information indicated that the event which gave rise to the charges occurred on March 26, 2018.

- 1 -

Morton filed a motion to transfer the case to juvenile court on June 25, 2018, and a hearing was held on the motion. At the time of the hearing, Morton was 17 years old. At the hearing, the State offered 11 exhibits into evidence. Several of the exhibits were Lincoln Police Department (LPD) reports related to the case detailing interviews with Morton and other witnesses. The exhibits also included the affidavit for Morton's arrest warrant; transcripts of interviews with Morgan by Lincoln police officers on April 24 and April 25, 2018; a LPD report concerning Morton's gang affiliation; Morton's Nebraska Juvenile Intake Summary; and a collection of criminal history information concerning individuals referenced in police reports.

In summary, the evidence offered by the State showed that on March 26, 2018, Morton's friend, P.B., was in a fight at school with several individuals, all of whom were sent home after the fight. Morton, who attended a different high school, was informed that the fight had occurred. P.B. subsequently picked up Morton from school and they drove to a residence to confront the individuals P.B. had been in the fight with and to continue the fight. There was another individual in the car with P.B. when Morton got in, and there were other individuals in another car with them. Both cars drove to the residence where the individuals lived who had fought P.B. earlier at school.

When the two cars arrived at the residence, they exited the vehicles and walked into the front yard of the residence. A verbal fight ensued between those who arrived in the vehicles and those who came out of the residence and were standing on the front porch. While standing in the yard, Morton had a gun in the pocket of his jacket. Morton told officers that P.B. had handed him the gun when they were getting out of the vehicle and asked him to hold it, which he agreed to do and put it in his jacket pocket. A short time later, a female from the residence got in a vehicle and drove around in the yard trying to run people over, and she struck one the individuals with Morton. After the individual was hit with the vehicle, Morton pulled the gun out of his pocket and fired the gun in the direction of the front porch where people were standing, and someone was hit by the gunshot and died. Morton told officers that he was not aiming at anyone in particular; he was just pointing the gun in the direction of the house. He pointed it in that direction because he knew that is where the other group was standing.

Morton offered six exhibits into evidence: a group of LPD reports from various officers in regard to this case; a LPD incident report related to the fight that occurred at school between P.B. and others; the curriculum vitae of Dr. Stephanie Bruhn; a report of an evaluation and assessment of Morton conducted by Bruhn; charges filed against another individual present at the offense at issue; and a juvenile petition, adjudication order, and disposition order pertaining to P.B.

Morton also called two witnesses to testify. The first witness was Bruhn, a licensed psychologist who worked for the Lincoln Regional Center and was in private practice with Strategic Psychological Services. Bruhn, at the request of Morton's counsel, had performed a risk assessment of Morton and identified his treatment needs. Bruhn described for the court her interviews, evaluations, and assessments of Morton. Bruhn testified that on the Structured Assessment of Violence Risk in Youth Instrument (SAVRY), Morton scored as "high-risk" in several categories including peer delinquency, stress, poor coping, and substance abuse difficulties. Morton also scored in the "moderate/high" risk range for general community violence. Bruhn diagnosed Morton with an unspecified depressive disorder and cannabis use disorder, at a moderate level. Bruhn attributed his depressive disorder to the fact that when Morton was 13 years

old, his father was murdered inside their home and Morton saw his deceased father and the aftermath of the murder in the home. Morton also indicated that he started using marijuana heavily after his father died.

Bruhn testified that she believed Morton needed and would benefit from treatment. She recommended Dialectical Behavior Therapy for Morton, which addresses stress tolerance, interpersonal effectiveness, and emotion regulation. Bruhn also recommended Aggression Replacement Therapy, a 12-week program designed to help an individual learn what makes him angry and how he responds to his anger, and how to develop more positive responses to anger. She also believed that Morton could benefit from working with a therapist who could address his personality difficulties. Bruhn testified that Morton could receive all of the treatment she recommended at either the Nebraska Correctional Youth Facility (NCYF), the Department of Corrections facility for youth, or the Youth Rehabilitation and Treatment Facility (YRTC), the juvenile court facility.

Bruhn also testified she had concerns regarding Morton's ability to succeed in treatment which included his dislike for authority, feelings of high self-worth, and a need for stimulation. She admitted however, that until therapy starts it is unknown whether these concerns would have a negative effect on Morton's treatment. Bruhn testified that she believed it was possible that Morton could be rehabilitated in the 2-year period before he reaches the age of majority if he dedicates and invests himself in the treatment process.

On cross-examination, Bruhn testified that she could not give a certain date when Morton will be rehabilitated because the length of time would depend on how invested Morton was in his rehabilitation. Bruhn again acknowledged that there were potential barriers to his treatment progress, as she previously testified. Bruhn admitted that the programs offered in the adult facilities would be somewhat different that the programs offered in the youth facilities but that the substance of the treatment Morton would receive would be the same whether it was at the YRTC or NCYF. Bruhn also testified that when a juvenile transitions out of NCYF, mental health staff in adult corrections assesses the individual's treatment needs based on what he/she participated in at NCYF.

Morton also called Beverly Hoagland, the chief deputy juvenile probation officer for Lancaster County. She explained the process that takes place after an individual is adjudicated in juvenile court and the two levels of supervision available through the Juvenile Probation Office. Hoagland also testified that it is not possible to predict how long it will take to rehabilitate a juvenile going through the juvenile court system because there are too many factors to consider.

Following the hearing, the district court denied the motion to transfer the matter to juvenile court. In its order, the district court considered the statutory factors set forth in Neb. Rev. Stat. § 43-276 (Reissue 2016) and concluded that a sound basis existed for it to maintain jurisdiction over the case.

## ASSIGNMENT OF ERROR

Morton assigns that the district court erred in finding that the State met its burden of establishing a sound basis for retention of the case in district court, thereby denying his motion to transfer to juvenile court.

STANDARD OF REVIEW

A trial court's denial of a motion to transfer a pending criminal proceeding to the juvenile court is reviewed for an abuse of discretion. *State v. Hunt*, 299 Neb. 573, 909 N.W.2d 363 (2018). An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *Id.*

ANALYSIS

Morton assigns that the district court erred in denying his motion to transfer the case to juvenile court. Neb. Rev. Stat. § 43-246.01(3) (Reissue 2016) grants concurrent jurisdiction to the juvenile court and the county or district courts over juvenile offenders who (1) are 11 years of age or older and commit a traffic offense that is not a felony or (2) are 14 years of age or older and commit a Class I, IA, IB, IC, ID, II, or IIA felony. Actions against these juveniles may be initiated either in juvenile court or in the county or district court. In the present case, all of the allegations against Morton put him within this category of juvenile offenders.

When an alleged offense is one over which both the juvenile court and the criminal court can exercise jurisdiction, a party can move to transfer the matter. For matters initiated in criminal court, a party can move to transfer it to juvenile court pursuant to Neb. Rev. Stat. § 29-1816(3) (Reissue 2016).

In the present case, when Morton moved to transfer his case to juvenile court, the district court conducted a hearing pursuant to § 29-1816(3)(a), which subsection requires consideration of the following factors set forth in § 43-276(1):

(a) The type of treatment such juvenile would most likely be amenable to; (b) whether there is evidence that the alleged offense included violence; (c) the motivation for the commission of the offense; (d) the age of the juvenile and the ages and circumstances of any others involved in the offense; (e) the previous history of the juvenile, including whether he or she had been convicted of any previous offenses or adjudicated in juvenile court; (f) the best interests of the juvenile; (g) consideration of public safety; (h) consideration of the juvenile's ability to appreciate the nature and seriousness of his or her conduct; (i) whether the best interests of the juvenile and the security of the public may require that the juvenile continue in secure detention or under supervision for a period extending beyond his or her minority and, if so, the available alternatives best suited to this purpose; (j) whether the victim agrees to participate in mediation; (k) whether there is a juvenile pretrial diversion program established pursuant to sections 43-260.02 to 43-260.07; (l) whether the juvenile has been convicted of or has acknowledged unauthorized use or possession of a firearm; (m) whether a juvenile court order has been issued for the juvenile pursuant to section 43-2,106.03; (n) whether the juvenile is a criminal street gang member; and (o) such other matters as the parties deem relevant to aid in the decision.

The customary rules of evidence shall not be followed at such hearing and, "[a]fter considering all the evidence and reasons presented by both parties, the case shall be transferred to

juvenile court unless a sound basis exists for retaining the case in county court or district court." § 29-1816(3)(a).

In order to retain the proceedings, the court need not resolve every factor against the juvenile, and there are no weighted factors and no prescribed method by which more or less weight is assigned to a specific factor. *State v. Comer*, 26 Neb. App. 270, 918 N.W.2d 13 (2018). In conducting a hearing on a motion to transfer a pending criminal case to juvenile court, the court should employ a balancing test by which public protection and societal security are weighed against the practical and nonproblematical rehabilitation of the juvenile. *Id*. The burden of proving a sound basis for retention lies with the State. *Id.*

Morton argues that the court erred in finding that the State met its burden of establishing a sound basis for retaining the case in district court. Morton contends that in making its finding on the statutory factors, the district court abused its discretion by relying on findings that were unsupported by the evidence or misstated the evidence, disregarding evidence weighing in favor of transfer, requiring that certain factors be proven by Morton with "certainty" or "ascertained definitively," and failing to clearly state which factors it weighed either in favor of or against transfer.

The district court set out each of the factors found in § 43-276 and made findings regarding each one. In regard to what treatment would benefit Morton, the court found that the treatment recommended by Bruhn could be provided by either juvenile court placement or the Department of Corrections facility for youth. Morton contends that the court found this factor to be neutral in considering whether to transfer the case, and that it should have found this factor weighed in favor of transfer.

Bruhn testified that Morton could receive all of the treatment she recommended at either the NCYF or the YRTC. Bruhn also testified that the programs offered in the NCYF and the YRTC would be somewhat different, but that the substance of the treatment Morton would receive would be the same at either facility. Bruhn also testified that when a juvenile transitions out of NCYF, mental health staff in adult corrections assesses the individual's treatment needs based on what he/she participated in at NCYF.

Regarding whether the offense included violence and the motivation for the offense, the court found that the motivation for the offense, as well as the resultant death of the individual that was shot was "clearly violent and arguably premeditated." The crime was violent in that a man was shot and died. The court's "arguably premeditated" finding comes from the fact that Morton was recruited by P.B. to go with him and others to retaliate for P.B.'s prior assault. The court stated that it may not have been the intent for anyone to die, but it was clear that the sole reason for the group going to the residence was for retribution or retaliation. Morton knew this was the reason they were going to the residence. The court further found that the motivation for the crime was to be part of a gang and to have the "back" of P.B., a member of a gang, as well as to respond to a perceived threat to himself and members of his group. The State presented a LPD report concerning Morton's gang affiliation. The report detailed Morton's documented gang membership status. It also states that the murder is this case was found to be and documented as gang related; the two groups involved in the fight that led to the shooting were rival gangs.

As to Morton's age, the district court noted that Morton was 16 years old at the time of the offense and 17 years old at the time of the hearing. He will turn 19 in September 2020. The district court also found that many of the other individuals involved in the events surrounding the offense ranged in age from 15 to 22 years old.

Morton argues that the court erred in failing to consider that a charge against P.B. in connection with the shooting was filed and handled in juvenile court. Morton points out that P.B. was the one initially involved in a fight at school and the one who recruited Morton and others to come with him to retaliate and further, was implicated as the person who gave the gun to Morton. P.B. is also 8 months older than Morton, making him that much closer to the age of majority. We cannot say that the court did not consider this information, as it was presented to it and received into evidence.

The district court acknowledged that Morton did not have any prior convictions or adjudications. However, in regard to another factor, Morton did acknowledge possessing and discharging a firearm in connection with the present charges.

In regard to best interests, the district court found that this factor could "cut both ways" because there was a recommendation for treatment, but "the length or efficacy of treatment" was not known and could extend beyond his minority. Morton argues that remaining in adult court where he may end up in the Department of Corrections was not in his best interests, especially considering that his treatment needs can be met through juvenile court. Bruhn testified that Morton could possibly be rehabilitated in the 2 years before reaching the age of majority if he has the desire to make treatment work. However, she had concerns regarding his ability to succeed in treatment. There was evidence raising doubt as to whether Morton could be rehabilitated during the period of time the juvenile court would have jurisdiction.

In considering public safety, the court noted that Morton was assessed as having a moderate/high risk for general community violence and Bruhn found that Morton demonstrated several risk factors that increase the risk for violence. Morton contends that the district court failed to "meaningfully consider" that Morton has no prior criminal history or involvement with juvenile court. He further argues that there was no evidence that Morton is a continued public safety risk or that he is likely to engage in additional criminal conduct if this case is handled in juvenile court. As set forth above, the district court recognized that Morton did not have any prior convictions or adjudications. Further, he is charged with second degree murder and other crimes involving the use of a gun, so public safety is a legitimate concern without knowing whether he will or will not engage in additional criminal conduct.

The next factor the court considered was the juvenile's ability to appreciate the nature and seriousness of his conduct. The court noted Bruhn's observation that Morton was trying to make himself look socially desirable, he had an inflated sense of self-worth, and disdain for following social traditions. However, Bruhn also indicated that Morton was a "bright young man" who knew right from wrong. Morton argues that it is unclear how the district court resolved this factor. However, the fact that Morton was "bright" and knew right from wrong seems to indicate that he understood the nature and seriousness of his conduct, indicating that his case should remain in the district court.

In considering whether the best interests of Morton and the security of the public may require that Morton continue in secure detention or under supervision for a period extending beyond his minority, the court found that the evidence presented showed there is a good chance Morton will need treatment beyond his minority, which was less than 2 years away at the time. The court found this factor significant because the juvenile court would have limited time to work with Morton, which would not start until after he was adjudicated. It further noted that the district court does not have the time constraints the juvenile court has and it has the same treatment options as the juvenile court. As Morton points out, there is no evidence to indicate with certainty that Morton will or will not need treatment beyond his minority. However, the court's concern that the juvenile court would have limited time to treat Morton was justified based on the evidence presented.

The court also found that the evidence showed that Morton is likely a member of a criminal street gang. Morton contends that the evidence was insufficient to show that Morton was a member of a gang. As previously discussed, the State presented a LPD report that detailed Morton's documented gang membership status, and stated that the murder in this case was found to be gang related.

Finally, in considering other factors, the court recognized that the Nebraska Juvenile Code is to be construed to remove juveniles from the criminal system whenever possible and reduce the possibility of their committing future law violations. However, it also considered the seriousness of the offense alleged, which it found to be a significant factor.

We conclude that the district court adequately considered all the factors set forth in § 43-276(1) and that the evidence supports the district court's denial of Morton's motion to transfer. Morton is charged with serious offenses--second degree murder, unlawful discharge of a firearm, and two counts of use of a firearm to commit a felony. Although he might not have intended to kill anyone when he shot the gun, the purpose for going to the house was to help P.B. retaliate for the fight that occurred earlier. Morton took possession of the gun when the group he was with arrived at the residence, putting it in his jacket pocket. He chose to shoot it in the direction of the porch on the front of the house where he knew people were standing.

When a court's basis for retaining jurisdiction over a juvenile is supported by appropriate evidence, it cannot be said that the court abused its discretion in refusing to transfer the case to the juvenile court. *State v. Blimling*, 25 Neb. App. 693, 911 N.W.2d 287 (2018). Upon our review of the record, we cannot say that the district court abused its discretion in denying Morton's motion to transfer to juvenile court and in finding a sound basis to retain jurisdiction in district court.

CONCLUSION

For the reasons stated in this opinion, we conclude that the district court did not abuse its discretion in denying Morton's motion to transfer the case to juvenile court. The judgment of the district court is affirmed.

AFFIRMED.